IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Docket No.: 0090 1:24CR00258-001 |
| ) | |
| JEFFREY A. WAKEFORD, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT JEFFREY A. WAKEFORD'S**
**MEMORANDUM IN AID OF SENTENCING**

COMES NOW Defendant Jeffrey A. Wakeford, by Assistant Federal Public Defender Daniel G. Cronin, and respectfully submits the following Memorandum in Aid of Sentencing:

**I. INTRODUCTION**

The Presentence Investigation Report filed in this case notes that under the Sentencing Guidelines, "...a sentence other than a sentence of imprisonment...is generally appropriate." PSR at ¶ 88. This Memorandum in Aid of Sentencing explains why a "*generally* appropriate" term of probation is *specifically* the right outcome for Jeffrey Wakeford.

Given the thoroughness of the Presentence Investigation Report, as well as the familiarity which this Court and government counsel already have with 18 U.S.C. § 3553(a), this pleading respectfully focuses on how the numbers zero to ten support probation for Mr. Wakeford. As explained below, each of those numbers has a connection to him - and to a reason for probation.

In all candor, undersigned counsel has never taken this "by the numbers" approach in previous sentencing memoranda. But then again, the undersigned has never before represented a defendant quite like Mr. Wakeford.

## II.  SENTENCING JEFFREY A. WAKEFORD "BY THE NUMBERS"

### Zero

Although Mr. Wakeford's total offense level reflects a two-level reduction for Acceptance of Responsibility, his Guidelines range is no lower on account of it.  As a defendant in Criminal History Category I, his range would be 0 - 6 months with a total offense level of four - just as it is for a total offense level of two (with the latter TOL reflecting his Acceptance of Responsibility).

The United States Sentencing Commission's "2023 Sourcebook of Federal Sentencing Statistics" documents a truth of which this Court and government counsel are well aware:  No other district has a higher percentage of defendants who go to trial.  Specifically, in Fiscal Year 2023, 22.9% of defendants charged in the United States District Court for the District of Columbia went to trial.  *See* Attachment 1, "Guilty Pleas and Trials in Each Circuit and District," Table 11 from the "2023 Sourcebook of Federal Sentencing Statistics."

By way of comparison, undersigned counsel's district - the Southern District of Illinois - had only 8.4% of defendants go to trial in FY 2023.  Id. at p. 2.  Moreover, only two districts besides the District Court for the District of Columbia had a "double digit" incidence of defendants proceeding to trial: Guam and the Eastern District of Oklahoma.  Id. at p. 3.  And both of those other districts had just barely over half the percentage of defendants going to trial as in this District.

In short, Mr. Wakeford would have been far from alone in going to trial - but his guilty plea was never in doubt.  That plea was entered just three months after the undersigned was assigned to represent him.  Although Mr. Wakeford's range is no different as a result of his Acceptance of Responsibility, probation instead of imprisonment would reflect his acceptance in a way that the Guidelines' Sentencing Table simply does not.

### One

The PSR states that the median term of imprisonment was only one month for defendants who, like Mr. Wakeford, had CHC 1, TOL 2, and were sentenced under U.S.S.G. § 2B2.3. Id. at ¶ 110. Going below this median term by just one month would hardly promote disrespect for the law or constitute an unwarranted sentencing disparity. Probation so often can only be accomplished by a downward variance. Here, it would be a Guidelines sentence - and only the smallest step away from the median sentence imposed on the extremely few similarly-situated defendants.

### Two

Mr. Wakeford deserves his two-level enhancement for trespassing on restricted grounds or building. But this does not make him more culpable than many Capitol breach defendants, since this enhancement applies in 46.2 % of cases under U.S.S.G. § 2B2.3. Moreover, another 48.7 % received two levels for the similar enhancement of trespassing at a secured government facility:

**USE OF GUIDELINES AND SPECIFIC OFFENSE CHARACTERISTICS**
**Guideline Calculation Based**
**Fiscal Year 2023**

| Guideline and SOC | Applied | Percent |
|---|---|---|
| §2B2.3 Trespass | 39 | 0.1 |
| (a)(1) Base offense level 4 | 39 | 100.0 |
| Chapter 2 Specific Offense Characteristic Adjustments | 37 | 94.9 |
| (b)(1)(A)(i) Occurred at a secured government facility (2 levels) | 19 | 48.7 |
| (b)(1)(A)(ii) Occurred at a nuclear energy facility (2 levels) | 0 | 0.0 |
| (b)(1)(A)(iii) Occurred on a vessel or aircraft of the United States (2 levels) | 0 | 0.0 |
| (b)(1)(A)(iv) Occurred in a secured area of an airport or seaport (2 levels) | 0 | 0.0 |
| (b)(1)(A)(vii) Any restricted building or grounds (2 levels) | 18 | 46.2 |

*See* Attachment 2, excerpt from the United States Sentencing Commission's "Use of Guidelines and Specific Offense Characteristics" for Fiscal Year 2023, for U.S.S.C. § 2B2.3.

**Three**

When deciding whether to imprison Jeffrey Wakeford, it is respectfully suggested that the impact of that imprisonment on recidivism should be considered. For its part, the United States Sentencing Commission has identified three possible relationships between incarceration and recidivism:

| Relationship | Description |
|---|---|
| Incarceration is preventative. | As the length of incarceration increases the likelihood of recidivism decreases. |
| Incarceration is criminogenic. | As the length of incarceration increases the likelihood of recidivism increases. |
| No relationship between incarceration and recidivism. | No statistically significant relationship between length of incarceration and recidivism is identified.[10] |

*See* Attachment 3, Excerpts from the United States Sentencing Commission's report, "Length of Incarceration and Recidivism," (June, 2022) at p. 3.

As the Sentencing Commission's report concedes, "Empirical research on the relationship between length of incarceration and recidivism is limited and presents mixed results." Id. (footnote omitted). With the Sentencing Commission so unsure about the relationship between imprisonment and recidivism, there is no certainty that incarcerating Mr. Wakeford will protect the public, deter crime, or better reflect the seriousness of his offense than probation will. In contrast, the dozen conditions of supervision proposed by the U.S. Probation Office are a surer way of accomplishing those goals of 18 U.S.C. § 3553(a) than a brief term of imprisonment would.

4

**Four**

As this Court is well aware, four years is the difference between the maximum terms of supervised release and probation which can be imposed on Mr. Wakeford. While the statutory maximum of five years of probation is not recommended by his Guidelines, that maximum is alluded to the Sentencing Commission's current "Worksheet for Sentenced Individuals":

**11. Length of Term of Probation** (See §5B1.2)

If probation is imposed, the guideline for the length of such term of probation is: (Check the applicable box)

☐ At least one year, but not more than five, years if the offense level total is 6 or greater.

☐ No more than three years if the offense level total is 5 or less.

*See* Attachment 4, Excerpts from United States Sentencing Commission, "Worksheet for Sentenced Individuals" (April, 2024). On the other hand, the maximum length of supervised release would be just one year - both by statute and as recommended by the Guidelines:

**b. Length of Term of Supervised Release**

Check the Class of the Offense:

☐ Class A or B Felony: Two to Five Year Term (*See* §5D1.2(a)(1))

☐ Class C or D Felony: One to Three Year Term (*See* §5D1.2(a)(2))

☐ Class E Felony or Class A Misdemeanor: One Year Term (*See* §5D1.2(a)(3))

☐ If a statutorily required mandatory minimum term of supervised release for the offense impacts the guideline range for the applicable Class of Offense above, also check this box, and list the statutory minimum term (*See* §5D1.2(c)):

_____ years mandatory minimum term of supervised release

☐ If an offense in 18 U.S.C. § 2332b(g)(5)(B) that resulted in, or created a foreseeable risk of, death or serious bodily injury to another person; or if a sex offense, the term of supervised release will not be less than the minimum term established above, and may be up to life (*See* §5D1.2(b)).

Policy Statement: If a sex offense, the *statutory maximum term* of supervised release is recommended.

Id. This four-year difference between the types of supervision weighs in favor of probation, since Mr. Wakeford can be supervised longer on probation than he could on supervised release.

**Five**

In 2017, the U.S. Probation Office did a test study of federal probationers in Texas, using the five self-study workbooks listed below:

**Readability of the client self-directed workbooks**

| Workbook Topic | Flesch-Kincaid Scale | |
|---|---|---|
| | Grade Level | Reading Ease[a] |
| Motivation | 5.2 | 79.7 |
| Anger | 4.5 | 80.9 |
| Criminal Attitudes | 6.2 | 72.6 |
| Peer Relationships | 5.3 | 75.7 |
| Substance Abuse | 6.0 | 73.0 |

[a] Higher scores indicate easier readability. Scores of 65 indicate plain English.

*See* Attachment 5, Ralph C. Serin and Stephanie M. Biro, "Self-Directed Workbooks: Evaluating Their Efficacy in a U.S. Probation Setting," 87 Federal Probation Journal 38 (June 2023) at p. 40. The researchers concede that more information is needed to truly gauge what that program is capable of (id. at p. 44), but concluded this pilot program reduced violations of probation:

> Individuals in the control group were 4.00 times more likely to have a technical violation and 2.33 times more likely to have any new charges, even though individuals in the workbook group were likely somewhat higher risk (i.e., younger, male, previous offense is a felony). This difference is encouraging, as some technical violations are related to factors that the workbooks target (e.g., avoiding substance use as a condition of probation). While the results of the current study are insufficient to fully support the efficacy of the set of work books in a community supervision setting, participants did not reject their use, nor did their use yield iatrogenic effects in this very small pilot study.

Id. at p. 42.

Mr. Wakeford is willing to complete these five workbooks, and undersigned counsel is willing to obtain them. They will help with rehabilitation, deterrence, and protection of the public.

**Six**

In 2020, at least six changes were made to the "Post-Conviction" section of the *Guide to Judiciary Policy*. These six evidence-based changes can help Mr. Wakeford succeed on probation:

- **Evidence-Based Practices as Guiding Framework for Supervision:** Probation offices provide supervision services in accordance with evidence-based practices. Probation offices should consider the principles of risk, need, responsivity, fidelity, and measurement when providing supervision services.

- **Evidence-Informed Methods to Guide Supervision:** All probation offices should provide supervision services in accordance with "evidence-informed methods," integrating (1) evidence-based practices; (2) other available evidence (e.g., from new and promising research or from other academic disciplines such as education, medicine, and implementation science); (3) the probation officer's professional judgment; and (4) the probation office's own evidence, which includes data on outcomes at the district level.

- **Replacement of Term "Offender" with "Person under Supervision":** Adopting the term "person under supervision" in lieu of "offender" recognizes that the label "offender" may negatively affect the working relationship between officers and persons under supervision and result in unintended consequences, including increased recidivism.

- **Monitoring, Restrictions, and Interventions Model:** The changes to the *Guide* move policy from a model of "controlling" and "correctional" strategies to a model of "monitoring, restrictions, and interventions." Under this model, "monitoring" is ...

- **"Lawful Self-Management" as a Goal of Supervision:** The changes to the *Guide* add "lawful self-management" as a goal of supervision. This term is defined as "the person's demonstrated ability to not commit a crime during the period of supervision and beyond."

- **Probation Officers as "Change Agents":** The changes to the *Guide* suggest that probation officers are the primary change agents and decision-makers in providing supervision services. In the "change agent" role, officers not only perform case management, but actively engage in facilitating change in the person on supervision.

*See* Attachment 6, Rachel Goldstein, "The Federal Probation and Pretrial Services System' Evidence-Based Journey," 84 Federal Probation Journal 44 (Sept. 2020) at pp. 44 - 45. These evidence-based changes further improve Mr. Wakeford's prospects for success on probation.

**Seven**

Jeffrey Wakeford understood when he entered into his Plea Agreement (Doc. 6) that probation was far from guaranteed. Even so, over seven out of ten (79.2 %) of defendants who were sentenced for "other" crimes in Fiscal Year 2023 received their Guidelines minimum:

**Table 34**

**POSITION OF WITHIN GUIDELINE RANGE SENTENCES
BY TYPE OF CRIME[1]
Fiscal Year 2023**

| TYPE OF CRIME | TOTAL | Guideline Minimum | | Lower Half of Range | | Midpoint of Range | | Upper Half of Range | | Guideline Maximum | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % | N | % |
| TOTAL | 24,210 | 9,566 | 39.5 | 5,094 | 21.0 | 2,777 | 11.5 | 3,139 | 13.0 | 3,634 | 15.0 |
| Other | 595 | 471 | 79.2 | 83 | 13.9 | 8 | 1.3 | 12 | 2.0 | 21 | 3.5 |

Excerpts from Table 34 (provided in full as Attachment 7), "2023 Sourcebook of Federal Sentencing Statistics," United States Sentencing Commission.

There is no indication that sentences of probation for more than seven out of ten defendants convicted - as is Jeffrey Wakeford - of "other crimes" have fostered disrespect for the law, failed to protect the public, nullified any deterrent effects of sentencing, or otherwise sabotaged the goals of 18 U.S.C. § 3553(a).

Indeed, a "Guidelines minimum" in this case, as in over seven out of ten "other crimes" sentences in Fiscal Year 2023, would promote a number of § 3553(a) objectives. In particular, probation would take Mr. Wakeford's Guidelines into account, reflect the sentences which are available, and avoid any unwarranted sentencing disparity.

**Eight**

The Presentence Investigation Report highlights the value of cognitive behavioral therapy, should Mr. Wakeford serve a term of imprisonment in the Bureau of Prisons. *See* PSR at ¶ 94. However, since he cannot receive a longer sentence than he would have otherwise to facilitate BOP programming (*see* United States v. Tapia, 564 U.S. 319 (2011)), any cognitive behavioral therapy would more realistically take place outside of prison.

That conclusion is reinforced by findings published just last month by the Department of Justice's National Institute of Justice. The annual report shows only around eight out of one hundred federal prisoners received the programming which they needed for antisocial cognition:

Table 1. SPARC-13 Needs and Program Assignments

| Domain | Program Matched to Need | Unassigned/Program Not Matched to Need |
|---|---|---|
| Dyslexia | 0.2% | 99.8% |
| Anger | 1.7% | 98.3% |
| Financial | 2.7% | 97.3% |
| Parenting/Family | 2.8% | 97.2% |
| Education | 3.8% | 96.2% |
| Antisocial Peers | 4.0% | 96.0% |
| Trauma | 4.4% | 95.6% |
| Mental Health | 6.5% | 93.5% |
| Work | 7.2% | 92.8% |
| Medical | 7.8% | 92.2% |
| Recreation | 7.9% | 92.1% |
| Antisocial Cognition | 8.3% | 91.7% |
| Substance Use | 11.4% | 88.6% |

Attachment 8, Table 1 from the National Institute of Justice's "2023 Review and Validation of the Federal Bureau of Prisons' Needs Assessment System." Mr. Wakeford is willing to work on any remaining antisocial cognition, but the odds are very much against the BOP being able to provide that counseling to him.

**Nine**

Mr. Wakeford 's allocution will be sincere - and will follow Dr. Harriet Lerner's "Nine Rules for True Apologies," Psychology Today (Sept. 2014), provided as Attachment 9:

1. **A true apology does not include the word "but" ("I'm sorry, but ...").** "But" automatically cancels out an apology, and nearly always introduces a criticism or excuse.

2. **A true apology keeps the focus on your actions—and *not* on the other person's response.** For example, "I'm sorry that you felt hurt by what I said at the party last night," is *not an apology*. Try instead, "I'm sorry about what I said at the party last night. It was insensitive and uncalled for." Own your behavior and apologize for it, period.

3. **A true apology does not overdo.** It stays focused on acknowledging the feelings of the hurt party without overshadowing them with your own pain or remorse.

4. **A true apology doesn't get caught up in who's to blame or who "started it."** Maybe you're only 14 percent to blame and maybe the other person provoked you. It can still help to simply say, "I'm sorry for my part in this."

5. **A true apology needs to be backed by corrective action.** If your sister mentions she's paid for your last few dinners together, apologize and let her know that you plan to pay for the next few.

6. **A true apology requires that you do your best to avoid a repeat performance.** Obviously, it doesn't help to apologize with a grand flourish and then continue the very behavior you apologized for. Passionate expressions of remorse are empty if you don't put sincere effort into ensuring that there is no repeat performance.

7. **A true apology should not serve to silence another person ("I said I'm sorry at least 10 times, so why are you still bringing up the affair?").** Nor should an apology be used as a quick way out to get yourself out of a difficult conversation or dispute.

8. **A true apology should not be offered to make you feel better if it risks making the hurt party feel *worse*.** Not all apologies are welcome. Making amends may be part of your healing process, but find another way to heal if the other person doesn't want to hear from you.

9. **A true apology recognizes when "I'm sorry" is not enough.** A serious hurt or betrayal requires repair work over time to restore trust.

**Ten**

The first page of Mr. Wakeford's PSR lists one related case: John Dine's. Out of all the words which pertain to Jeffrey Wakeford, ten of the most important ones were relayed by Mr. Dine to the FBI. After Mr. Dine explained that Mr. Wakeford saw someone in the Capitol kicking or trying to kick down a door, Mr. Dine added:

**"...WAKEFORD instructed this individual to stop what he was doing."**

On January 6, 2021, Jeffrey Wakeford was part of a tragic escalation. His choices were not just wrong; they were criminal. But his was also a voice of reason and restraint - at exactly the moment when those qualities were in such short supply. Ten words are not enough to prevent him from being sentenced, at age 56, for his first non-traffic offense. But perhaps they, and the other numbers discussed *supra*, are enough to keep him out of prison.

### III.  CONCLUSION

Probation for Mr. Wakeford means he can be supervised longer than on supervised release. Probation means he can begin counseling sooner rather than later. And probation means he can begin paying restitution in larger installments than from prison. Putting Jeffrey Wakeford on probation would be the best outcome for him - and the best outcome for the rest of us.

Respectfully submitted,

/s/ Daniel G. Cronin
DANIEL G. CRONIN
Assistant Federal Public Defender
650 Missouri Avenue, Room G10A
East St. Louis, Illinois 62201
Dan_Cronin@fd.org
(618) 482-9050
ATTORNEY FOR DEFENDANT
JEFFREY A. WAKEFORD

**CERTIFICATE OF SERVICE**

The undersigned attorney certifies that on October 10, 2024, he provided this document to:

Patrick C. Holvey
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530

via electronic filing with the Clerk of Court using the CM/ECF system, and to:

Gabriela Hernandez-Ramirez
United States Probation Officer
U.S. Probation Office for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

via e-mail.

/s/ Daniel G. Cronin
DANIEL G. CRONIN