## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 24-cr-258 (CJN)** |
| v. | : | |
| | : | |
| JEFFREY WAKEFORD, | : | |
| | : | |
| Defendant | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jeffrey Wakeford to fourteen days' incarceration along with a probationary term of three years, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Jeffrey Wakeford, a fifty-six-year-old male, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Wakeford pleaded guilty to a violation of 18 U.S.C. § 1752(a)(1). The government's recommendation is supported by the defendant's choice to enter and remain within the Capitol for twenty minutes, only leaving when ordered to do so by uniformed police.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Wakeford's crime support a sentence of fourteen days' incarceration along with a probationary term of three years, 60 hours of community service, and $500 in restitution.

## II.      Factual and Procedural Background

### *The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 7 (Statement of Offense).

### *Defendant Wakeford's Role in the January 6, 2021, Attack on the Capitol*

Wakeford began January 6, 2021, at the Rally at the Ellipse where he attended the speech given by then-President Donald Trump.  He attended the Rally with Nicholas Reimler and John Dine; Dine is his cousin and Reimler was Dine's co-worker.  The three of them traveled together throughout the events of January 6, 2021.  *See* Image 1 (below) (Wakeford in box (center), Dine in tan coat and sunglasses (left), Reimler in green beanie (left)).



*Image 1: Wakeford (red hair, gray hooded sweatshirt, black coat) at the rally in front of the Washington Monument.* [2]

Following the rally, Wakeford walked to the Capitol, along with a large crowd from the rally.  He walked up from the lower west terrace of the Capitol to the upper west terrace.  As stated in his interview (discussed *infra*), Wakeford observed the chaos, including violent altercations between rioters and police, that the west front of the Capitol had devolved into by the time he arrived.  He did not participate in any violent actions or altercations with the police but did walk through the crowd to the upper west terrace.  *See, e.g.*, Image 2 (below), showing Wakeford taking a selfie with rioters on the west terrace railings; *see also* Image 3 (below), showing Wakeford passing by uniformed MPD officers on the upper west terrace.

---

[2] Where present, red annotations on images have been applied for purposes of clarity and are not present in the original.



*Image 2 (left): Selfie taken outside the Capitol.  Wakeford in center.*
*Image 3 (right): Metropolitan Police Department body worn camera footage (timestamp 15:04)*
*showing Wakeford (center) outside the Capitol using his cell phone.*



*Image 4: Wakeford entering Captiol via Senate*
*Wing Door at 3:07 PM (magnified inset;*
*Wakeford in baseball-style hat on in center)*

As captured on closed-captioned television ("CCTV") footage from inside the Capitol, Wakeford

entered the Capitol at 3:07 p.m., through the Senate Wing Door.  *See* Image 4 (above).  At this

time, windows adjacent to the Senate Wing Door were broken, alarms were blaring, and rioters

4

were entering and exiting the Capitol through the broken windows as well as the Senate Wing Door, that rioters broke open less than an hour before.  Wakeford saw altercations between the crowd of rioters and police officers at the Capitol throughout his time on Capitol grounds and personally saw the broken windows adjacent to Senate Wing Door.

After entering the Capitol via the Senate Wing Door, Wakeford turned right and walked down a hallway toward the Crypt.  At this time, while moving down the hallway, Wakeford entered an office or conference room and observed a rioter attempting to kick in a door inside that room.  Wakeford stated in a later interview (discussed *infra*) that he told the rioter to stop attempting to kick in the door inside that office.  Wakeford then continued to the Crypt.

Wakeford entered and remained in the Crypt for approximately eleven minutes.  As captured on CCTV at approximately 3:23 pm time, Wakeford crossed the Crypt, passed police officers as he walked to the center of the Crypt, then walked out of the Crypt, and followed the hallway back to the Senate Wing Door.  *See* Image 5 (below).  During his time in the Crypt, it appears that he was sitting on a bench on the outer perimeter for approximately nine minutes with Dine and Reimler either sitting with him or standing nearby.



*(a)*                                           *(b)*

*Image 4: (a) Wakeford moved from wall of Crypt towards center then (b) exited other side of Crypt at approximately 3:24 PM.*

Once back in the hallway near the Senate Wing Door, Wakeford exited the Capitol through a broken window next to the Senate Wing Door at approximately 3:27 PM.  *See* Image 6 (below). Wakeford had to exit through the window because the US Capitol Police had succeeded in closing the Senate Wing Door, preventing further rioter entry.  However, rioters still needed to be removed (and the USCP did not want to risk being overrun by reopening the door.  As a result, rioters inside the Capitol at that time had to leave via the window.  Wakeford had to be helped through the window in order to exit.  After exiting the Capitol, Wakeford later left the Capitol grounds.



*Image 6: Wakeford (red box) exiting through broken window next to Senate Wing Door*

*Defendant's Interview*

On December 7, 2023, FBI agents interviewed Wakeford.  Wakeford shared the following:

On January 5, 2021, Wakeford drove from his home in Granite City, IL, to the Washington, D.C.

metro area with two other individuals.[3]   Wakeford and the other individuals spent the night of January 5, 2021, in a motel in the D.C metro area.

Wakeford had followed the 2020 Presidential election.   He was convinced that the 2020 election, like every election in the United States (in his opinion), was rigged. Wakeford chose to travel to Washington D.C. specifically to attend then-President Trump's "Stop the Steal" rally. *See* Image 1.   He was excited to go to the rally to show his support of Donald Trump.

Wakeford confirmed that after the rally, he proceeded to the Capitol building and, after he entered the Capitol, he walked down the hallway to the right of the Senate Wing Door.   Wakeford stated that while in the Capitol, he entered an office and observed a rioter attempting to kick in a door inside that office.   Wakeford also stated he told the rioter to stop attempting to kick in the door inside that office.

Regarding his time spent in the Crypt, Wakeford stated that at some point after he entered the Crypt, a police officer instructed him, along with other rioters, to group in the center of the room.   These statements confirm the sequence of events captured by CCTV footage, discussed above. *See* Image 5.

Wakeford admitted that he exited the Capitol through a broken window.   Wakeford stated he needed help to get through the window and that the windowpane he exited through no longer had glass in it.   Wakeford stated he noticed some of the upper panes in the window had broken glass in them.   He had to be helped through the window. *See* Image 6.

---

[3] As discussed, *infra*, Wakeford was accompanied by two other individuals: John Dine and Nicholas Reimler.   Reimler has already been prosecuted and sentenced; Dine has pled guilty and will be sentenced by Judge Cobb on November 1, 2024.

During the December 7, 2023, interview, Wakeford identified himself and his traveling companions in various photographs and still images taken from CCTV footage, including the CCTV footage from which stills have been taken above.  *See, e.g.*, Image 4, 5, and 6.

*The Charges and Plea Agreement*

On May 29, 2024, the United States charged Wakeford by a four-count Information with violating 18 U.S.C. § 1752(a)(1 and 2) and 40 U.S.C. § 5104 (D and G).  On July 17, 2024, pursuant to a plea agreement, Wakeford pleaded guilty to Count One of the Information, which charged him with a violation of 18 U.S.C. 1752(a)(1). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.     Statutory Penalties

Wakeford now faces a sentencing for violating 18 U.S.C. § 1752(a)(1).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment, a term of supervised release not to exceed one year and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.     The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | - 2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 32-41.

U.S.S.G. § 4C1.1 provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

While the Government concedes that Section 4C1.1 applies to Wakeford, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus, the defendant's conduct caused a significant disruption to a vital governmental function,

warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated Wakeford's criminal history as a Category I. PSR at ¶ 44. Accordingly, the U.S. Probation Office calculated Wakeford's total adjusted offense level, after acceptance, at 4,[4] and his corresponding Guidelines imprisonment range at zero months to six months. PSR at ¶ 87. Wakeford's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court

---

[4] U.S. Probation Office further recommended application of the Chapter Four Adjustment, bringing the total offense level to 2. PSR at ¶ 41.

knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal intrusion—the Guidelines are a powerful driver of consistency and fairness.

## V.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of fourteen days' incarceration along with a probationary term of three years.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Wakeford's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Wakeford, the absence of violent or destructive acts is not a mitigating factor. Had Wakeford engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Wakeford's case is his perseverance in pursuing this course of criminal conduct.  He persisted through the chaos of the day at every stage of the events of January 6, 2021 – crossing the core of the Capital City, climbing the stairs on the West Face of

11

the Capitol even while the riot was in full bloom and, eventually, entering the Capitol Building through the rioting crowd and making his way through that crowd into the Crypt.   Additionally relevant is the amount of time he spent within the Capitol – he spent approximately twenty minutes within the Capitol, contributing to the mob and swelling its ranks during that time; he was present in the Crypt as police began a round of clearing rioters and notably did not make any moves to leave prior to being ordered to by police.   This was not a brief intrusion – this was a substantial entry with defined movement and presence within the seat of our Nation's government.   And Wakeford's decision to leave was not his own – only when the police began to control the area and were able to effectively order his exit did he begin to do so.   Even his manner of exit shows how different the circumstances were at his exit: while he had entered through the Senate Wing Door as a member of the riot, he left through a broken window because the police had begun to resecure parts of the Capitol.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Wakeford's History and Characteristics

Wakeford has a battery charge from 2001.   *See* PSR at ¶¶ 45-46.[5]   Additionally, the lack of criminal history, like here, is specifically encapsulated by the guidelines already and does not warrant further mitigation on that basis alone.   Indeed, the data which led the Sentencing

---

[5]     Date of Arrest:        02/18/2001 (Age 32)
        Charge:                Battery/Bodily Harm
                               Madison County Circuit Court
                               Edwardsville, IL (01CM400260)
        Agency:                Granite City Police Department, Granite City, IL
        Disposition:           Nolle Prosequi (06/18/2001)

Commission to enact 4C1.1 is not predictive when political violence, like Wakeford's crime, is at issue, and still a present concern.

As noted above, the Court may consider Wakeford's health; however, Wakeford had the same health issues on January 6, 2021. These health issues did not preclude him from traveling to D.C., traveling from the Ellipse to the Capitol or, once there, entering and remaining in the Capitol.

On January 6, 2021, Wakeford was married. He is now divorced. He has two children and two grandsons. Despite that strong network of support, the defendant callously put his actions above any concern for his family by committing this offense. He committed these offenses knowing the likely risks.

Therefore, a lengthy period of probation combined with a short period of incarceration is warranted to ensure that he is supervised while in the community and that he does not again engage in the type of conduct that brought him before this Court in this case.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.  As this Court has noted, "others must be sufficiently deterred from engaging in similar actions. Being around and within a violent riot prevents police from dealing with those who are violent." *United States v. Joshua Doolin*, 21-cr-447 (CJN), Sentencing Tr. at 81 (Nichols, J.).

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration along with a period of probation.  The persistence with which Wakeford engaged in the offensive conduct shows that specific deterrence is necessary.  It is not sufficient to keep him under probation's supervision; this Court should require incarceration in order to ensure that he understands, and remembers, the seriousness of his actions on January 6, 2021, and does not again engage in participation in a violent mob or other political violence.  As this Court has noted, "as I've said in every case I've had, every participant in the riots made an

impact, as one of the primary strengths of the rioters on that day was their sheer number leading to many circumstances in which law enforcement was overwhelmed." *United States v. Joshua Doolin*, 21-cr-447 (CJN), Sentencing Tr. at 79 (Nichols, J.).

At the same time, others beyond Wakeford must be sufficiently deterred from engaging in similar actions. Being around and within a violent riot prevents police from dealing with those who are violent. Future presence in mob actions by others must be deterred.

The Court must sentence Wakeford in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[6] This Court must sentence Wakeford based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Wakeford has pleaded guilty to Count One of the Information, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply.

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022, Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following case provides the most suitable comparison to the relevant sentencing considerations in this case.

The government rarely recommends home detention for January 6 defendants, including misdemeanants; its recommendation often include at least some period of incarceration. Where it has, that recommendation commonly comes either from earlier cases where there were few comparators (especially as compared to now) or especially unique circumstances. Neither of those situations are present here; a standard sentence of incarceration is, therefore, appropriate.

For example, in *United States v. Ruben Reyna*, 23-cr-5350 (CKK), the government recommended 14 days' incarceration and 12 months' probation and the court imposed that

recommendation on a guilty plea as to 18 U.S.C. § 1752(a)(1), as here.  ECF 25 (Sentencing Memorandum), 34 (Judgment).  Reyna was only in the Capitol for one minute; Wakeford was in the Capitol for twenty.  And, similar to Reyna, Wakeford entered through a broken door (Reyna through a broken window).  Reyna had additional conduct, such as posting multiple images of his actions to Facebook; here, Wakeford did not.

Another example of a standard recommendation may be found in *United States v. William Wilkerson*, 23-cr-249 (CJN), where the Government recommended thirty days' incarceration and the Court imposed two years' probation on a guilty plea as to 40 U.S.C. § 5104(e)(2)(G).  ECF 21 (Sentencing Memo), ECF 24 (Judgment).  Wilkerson was in the Capitol only for approximately five minutes; Wakeford was in the Capitol for twenty.  Wilkerson did not proceed beyond the Senate Wing Door hallway; Wakeford proceeded beyond the hallway to an office/conference room and, later, the Crypt.  However, Wilkerson showed no remorse in a voluntary post-arrest interview and also posted multiple times on social media after his incursion into the Capitol.

It is true that Wakeford's traveling companion, Nicholas Reimler, has already been sentenced.  *See United States v. Nicholas Reimler*, 1:21-cr-239.  While Reimler's conduct was very similar to Wakeford's, the government's recommendation here necessarily differs as described above.  Reimler pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G).  *But* Reimler pled guilty on September 17, 2021, when there were very few comparators.  Judge Moss sentenced Reimler to one month home detention in December 2021 with thirty-six (36) months of probation, 60 hours community service (to be completed within thirty months), and $500 restitution.  Sentencing Hrg. Tr. at 26.  In addition, Judge Moss restricted Reimler's social media usage as a special condition of probation.  In that sentence, Judge Moss specifically cited this Court's sentences in the *Gallagher* and *Sweet* and *Fitchett* cases as the basis for Reimler's

17

sentence.  Here, we now have more fulsome comparators and the government's (and the Court's) understanding of the full scope of the criminal conduct of January 6, 2021, has developed since that time.  Accordingly, the government's recommendation reflects this current understanding and adequately accounts for the seriousness of Wakeford's criminal conduct on January 6.

Additionally, Wakeford's third traveling companion, John Dine, pled guilty to two counts of violating 40 U.S.C. § 5104(e)(2)(D), and (G).  *United States v. John Dine*, 1:24-cr-259, ECF Minute Order (June 27, 2024).  Dine's conduct is similar to Wakeford's conduct and the government's recommendation to Judge Cobb is also fourteen days' incarceration and thirty-six months' probation.  Dine's sentencing is on November 1, 2024.  The government will inform Judge Cobb of this Court's sentence imposed on Wakeford.  The basis for the government's recommendation in Dine mirrors the basis of its recommendation for Wakeford.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.      Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Wakeford must pay $500 in restitution, which reflects in part the role Wakeford played in the riot on January 6.[8] Plea Agreement at ¶ 12 (p. 8). As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

has since been updated by the Architect of the Capitol, USCP, and MPD.) Wakeford's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 106.

## VII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to fourteen days' incarceration along with a probationary term of three years, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Wakeford's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/Patrick Holvey*
PATRICK HOLVEY
DC Bar No. 1047142
Assistant United States Attorney
United States Attorney's Office
601 D Street N.W.
Washington, D.C. 20530
Telephone: 202-252-7224
Patrick.Holvey@usdoj.gov